ORIGINAL                                                    ORIGINAL

1   **Robert J. Beles** Bar No. 41993
    **Paul McCarthy** Bar no. 139497
2   One Kaiser Plaza, Suite 2300
    Oakland, California 94612-3642
3   Tel No. (510) 836-0100
    Fax. No. (510) 832-3690
4
    Attorneys for *Petitioner*
5

6

7

8                           United States District Court
                            Northern District of California
9

10  | Jorge Garcia,                          | No. |

11              *Petitioner,*                PETITION FOR WRIT OF HABEAS CORPUS;
        vs.                                  MEMORANDUM OF POINTS AND
12                                           AUTHORITIES
    Robert Horel, Warden, Pelican Bay
13  State Prison,

14              *Respondent.*

15  People of the State of California,

16              *Real Party in Interest.*

17

18              **PETITION FOR WRIT OF HABEAS CORPUS**

19          **MEMORANDUM OF POINTS AND AUTHORITIES**

20

21

22

23

24

25

26

27

28

ORIGINAL                                                                 ORIGINAL

# TABLE OF CONTENTS

*item*                                                        *page number*

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PETITION FOR WRIT OF HABEAS CORPUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    1.  Statement of Custody and Conviction. . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    2.  Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    3. Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

        a.  Prosecution's case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

        b.  Defense case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-3

        c. Prosecution's  closing argument. . . . . . . . . . . . . . . . . . . . . . . .  p-5

    4.  Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-7

    5. Need for habeas remedy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-8

    6. Need for evidentiary hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-8

    7. Relief requested. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-8

VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-9

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . .  m-1

    1. The prosecutor improperly referred to matters during closing argument that were outside of the evidence presented at trial, and misrepresented evidence that had been presented at trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

        a. "Islamic law". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

        b. Dr. Shomer's fee.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-2

        c. Identification "close up, under bright lights". . . . . . . . . . . . . . . . .  m-3

        d. Effect of stress on accuracy of identification.. . . . . . . . . . . . . . . .  m-4

        e. Earlier incorrect identification affected by morphine.. . . . . . . . . . . .  m-5

        f. Petitioner had "changed his appearance" to avoid being recognized as the shooter.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-6

        g. Applicable law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-7

    2. The prosecutor improperly misstated the law. . . . . . . . . . . . . . . . . . . . . . .  m-9

        a. Inviting jurors to rely on the expertise of other jurors concerning interpretation of medical records.. . . . . . . . . . . . . . . . . . . . . . . .  m-9

i

ORIGINAL                                          ORIGINAL

*item*                                                                      *page number*

      b. Mischaracterizing reasonable doubt; burden shifting.. . . . . . . . . . . . .  m-10

3. Trial counsel was ineffective in failing to object to the errors described in this
petition or seek appropriate relief for such errors... . . . . . . . . . . . . . . . . . . . . .  m-10

4. Petitioner would be entitled to an evidentiary hearing on the issue of ineffective
assistance of counsel if respondent raises a material dispute on the issue.. . . . . .  m-11

5. Cumulative error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-16

6. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-16

ii

ORIGINAL                                    ORIGINAL

# TABLE OF AUTHORITIES

*cases*                                                              page number

*Bains v. Cambra*, 204 F.3d 964, 974-75 (9th Cir. 2000) . . . . . . . . . . . . . . . p-8, m-10, m-12

*Baja v. Ducharme*, 187 F.3d 1075 (9th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . m-12

*Commonwealth of Northern Marianas Islands v. Mendiola*,
976 F.2d 475 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-8

*Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). . . . .  m-8

*Drayden v. White*, 232 F.3d 704 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . m-7

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005). . . . . . . . . . . . . . . . . .  m-12, m-13, m-15

*Hall v. Whitley*, 935 F.2d 164 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . m-8

*In re Lawler* (1979) 23 Cal.3d 190. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-15

*In re Lewallen* (1979) 23 Cal.3d 274. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-15

*In re Malone* (1996) 12 Cal. 4th 935. . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-9

*Insyxiengmay v. Morgan*, 403 F.3d 657 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . m-12

*Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . m-13

*Keeney v. Tamayo-Reyes,* 504 U.S. 1,  112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992). . . . .  m-12

*Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). . . . . . . .  m-13

*People v. Bell* (1989) 49 Cal. 3d 502. . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

*People v. Bolton* (1979) 23 Cal.3d 208. . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-7

*People v. Donaldson* (2001) 93 Cal. App. 4th 916. . . . . . . . . . . . . . . . . . . . .  m-10, m-11

*People v. Frye* (1998) 18 Cal.4th 894. . . . . . . . . . . . . . . . . . . . . . . . . . . . m-7

*People v. Gionis* (1995) 9 Cal.4th 1196. . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

*People v. Harper* (1986) 186 Cal.App.3d 1420.. . . . . . . . . . . . . . . . . . . . . . . . . m-9

*People v. Hill* (1998) 17 Cal. 4th 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

*People v. Johnson* (1981) 121 Cal.App.3d 94. . . . . . . . . . . . . . . . . . . . . . . . . m-7

*People v. Ledesma* (1987) 43 Cal. 3d 171. . . . . . . . . . . . . . . . . . . . . . . . . m-10

*People v. Morris* (1988) 46 Cal.3d 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-7

*People v. Parmelee* (1934) 138 Cal.App. 123. . . . . . . . . . . . . . . . . . . . . . . . . m-2

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                        ORIGINAL

1   *People v. Pope* (1979) 23 Cal. 3d 412. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

2   *People v. Purvis* (1963) 60 Cal. 2d 323 . . . . . . . . . . . . . . . . . . . . . . . . . . . m-7

3   *People v. Simon* (1927) 80 Cal.App. 675. . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

4   *People v. Singh* (1936) 11 Cal. App.2d 244. . . . . . . . . . . . . . . . . . . . . . . . . m-2

5   *People v. Steele* (2002) 27 Cal.4th 1230. . . . . . . . . . . . . . . . . . . . . . . . . . . m-9

6   *People v. Thomas* (1992) 2 Cal. 4th 489. . . . . . . . . . . . . . . . . . . . . . . . . . . m-7

7   *People v. Villa* (1980) 109 Cal.App.3d 360. . . . . . . . . . . . . . . . . . . . . . . . . m-7

8   *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001). . . . . . . . . . . . . . . . . m-13

9   *Reutter v. Solem*, 888 F.2d 578 (8th Cir.1989). . . . . . . . . . . . . . . . . . . . . m-8

10  *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). . . . . . . . m-10

11  *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004). . . . . . . . . . . . . m-13

12  *Strickland v. Washington* (1984) 466 U.S. 668, 104 S. Ct. 2052,
    80 L. Ed. 2d 674. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10, m-15

13  *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) . . . . . . . . . . . . . . m-13, m-15

14  *Thomas v. Hubbard*, 273 F.3d 1164 (9th Cir. 2002). . . . . . . . . . . . . . . . . m-16

15  *Townsend v Sain*, 372 US 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963). . . . . . . m-11-13, m-15

16  *United States v. Artus*, 591 F.2d 526 (9th Cir. 1979.) . . . . . . . . . . . . . . . . m-8

17  *United States v. Cabrera*, 222 F.3d 590 (9th Cir. 2000) . . . . . . . . . . . . . . m-2

18  *United States v. Kojayan*, 8 F.3d 1315. . . . . . . . . . . . . . . . . . . . . . . . . . . m-8

19  *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) . . . . . . . . . . . . . . m-8

20  *United States v. Leon-Reyes*, 177 F.3d 816 (9th Cir. 1999). . . . . . . . . . . . . m-8

21  *United States v. Marques*, 600 F.2d 742 (9th Cir.1979). . . . . . . . . . . . . . . m-8

22  *United States v. Ramirez-Lopez* (9th Cir 2003) 315 F.3d 1143 . . . . . . . . . . m-7

23  *United States v. Solivan* (6th Cir. 1991) 937 F.2d 1146 . . . . . . . . . . . . . . m-8

24  *United States v. Valentine*, 820 F.2d 565(2nd Cir. 1987). . . . . . . . . . . . . . . m-8

25  *United States v. Weatherspoon,* 410 F.3d 1142 (9th Cir. 2005) . . . . . . . . . . m-8

26  *Williams v. Taylor*, 529 U.S. 420, 146 L. Ed. 2d 435, 120 S. Ct. 1479 (2000). . . . . . . m-12

27

28

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                            ORIGINAL

*statutes*                                                    *page number*

28 U.S.C. section 2244(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-8

California Rules of Court 4.551(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-2

Penal Code section 187(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-12

Penal Code section 245(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-8

Penal Code section 664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-8

Rule 8(a) of the Rules Governing Section 2254 Cases . . . . . . . . . . . . . . . . . . . . . . . .  m-7

United States Constitution, Fifth Amendment,
(due process). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-7, p-8, m-8 m-2

United States Constitution, Fifth Amendment, (proof beyond a reasonable doubt). . . . .  m-10

United States Constitution, Fourteenth Amendment (due process). . . . . . .  p-7, p-8, m-8, m-10

United States Constitution, Sixth Amendment
(assistance of counsel). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-7, p-8, m-2, m-10, m-12 m-15

# United States District Court
## Northern District of California

JORGE GARCIA,

        *Petitioner,*
   vs.

ROBERT HOREL, Warden, Pelican Bay State Prison,

        *Respondent.*

PEOPLE OF THE STATE OF CALIFORNIA,

        *Real Party in Interest.*

No.

PETITION FOR WRIT OF HABEAS CORPUS

## PETITION FOR WRIT OF HABEAS CORPUS

Comes now petitioner, and petitions this court for a writ of habeas corpus.

### 1. Statement of Custody and Conviction

1. On November 29, 2004, following a jury trial, (C.T. 257) petitioner was convicted of premeditated attempted murder, Penal Code section 187(a)/664, assault with a firearm, Penal Code section 245(a)(2), and various firearms and gang enhancements. Petitioner was sentenced on March 18, 2005 to 25 years to life in state prison. (C.T. 278-279.) He is presently in the custody of Robert Horel, Warden, Pelican Bay State Prison.

### 2. Statement of Jurisdiction

2. The California Supreme Court denied direct review on November 29, 2007.  This petition is filed within one year of the California Supreme Court's denial of review and is timely under 28 U.S.C. section 2244(d).

### 3. Statement of the Case

3. This case arose from a shooting in Fremont, California, allegedly involving two rival youth gangs, the Norteños and the Sureños.

#### a. Prosecution's case

4. Ben Cruz was an admitted member of the Norteños at the time the incident occurred. On the evening of August 24, 2003, when he was 15 years old, he was in a park in Fremont with

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                    ORIGINAL

a friend, Jason Wodopianov, drinking beer and waiting for some girls . (R.T.. 206-208.) Cruz was wearing red clothing, an informal uniform of Norteño members. The record does not disclose what color clothes Wodopianov was wearing. As Cruz and Wodopianov were walking towards a nearby pay phone, a car stopped. A man got out of the car and yelled "chap" (Sureño slang for a Norteño gang member.)  He threw a bottle at Cruz. (R.T.. 213.) Another man then got out of the car with a shotgun, pointed the gun at Cruz, and fired from about 40 feet away. (R.T.. 214-215.) Cruz immediately turned and ran when he saw the shotgun.  He was running away when he was hit by shotgun pellets. Cruz continued to run and ended up on the porch of a nearby house out of range of the shotgun. (R.T. 218-219.) The assailants drove off.

5.  When the police arrived, Cruz told them that some "scraps", (Norteño slang for Sureño gang members), had shot him. (R.T. 222.) Cruz described the suspects' car as an "old school" brown Cadillac or Lincoln. (R.T. 224.) He told the officers that he had not seen any of the faces of the people in the car, did not recognize any of them, and that all of them were wearing black "hoodies", a kind of sweatshirt that covers the head. (R.T. 140).

6.  Officer Jeffrey Farmer responded to a police broadcast at about 10:20 PM that described the suspects' car as a four-door cream-colored older model Cadillac. (TR. 95.) Farmer then saw a 1989 brown Oldsmobile at about 10:28 PM on the same evening and stopped it on a hunch that it might be the one described. ((R.T. 97.) Only one individual, Alfonso Martinez, was in the car. He told Farmer that he had just dropped off friends after spending a day at the beach in Half Moon Bay. ((R.T. 98.) Martinez was wearing blue clothing, a color associated with the Sureños, but not a black "hoodie" as described by Cruz.  Officer Farmer observed various abbreviations and symbols written and scratched on the interior and exterior of the car that were associated with the Sureños. Officer Farmer arrested Martinez for driving without a license and towed the car. No guns were found in the car, but the police found a camera containing film. The pictures showed Martinez, petitioner, and various other individuals believed to be Sureño members at a beach, making hand signals that police described as associated with the Sureños.

7.  Detective Jason Lambert talked to petitioner two days later. Petitioner admitted that he had been at the beach at Half Moon Bay on August 24, 2003.

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                    ORIGINAL

8.  Detective Carattini showed Cruz a photo lineup when he was in Kaiser Hospital, at least a week after the incident. (R.T. 225, 228). Cruz picked out an individual other than petitioner, telling Carattini that the individual was possibly the shooter. (R.T. 229.)

9.  On November 13, 2003, about ten weeks after the incident and after Cruz had been out of the hospital for some time, Detective Lambert showed him a photo lineup containing petitioner's photo. ((R.T. 231.) Cruz testified at trial that he had told Lambert that he was "100% certain" that petitioner's photo was of the gunman. ((R.T. 232.) The notes from the photo lineup, however, show that Cruz checked a box that said "I cannot positively identify anyone in the photographs" and stated merely that petitioner's photo "looks like" the gunman. ((R.T. 346.)  Cruz admitted on cross-examination that he had identified petitioner only as a "possible." (R.T. 255.)  Cruz also identified another individual from the photo lineup as the bottle-thrower (R.T. 345) "depending upon] how tall he is." (R.T. 348.)

10.  On November 19, 2003, Cruz attended a physical lineup (R.T. 232) and identified petitioner and another individual in the same lineup as a "possible" gunman and bottle-thrower, respectively. (R.T. 233, 255.) [1]  Cruz identified petitioner in court as the gunman (a rather obvious choice, since petitioner was sitting at the defense table next to a non-Hispanic, older defense attorney.) (R.T. 201.)

11.  Cruz admitted that at some time after the incident, he was himself charged as a juvenile with a robbery and placed in a residential juvenile camp. (R.T. 204.)

12.  Wodopiaonov, who had apparently witnessed the shooting, was not called to testify as a witness. (R.T. 324 and 325.)

**b.  Defense case**

13.  Petitioner did not testify in his own defense.  The defense called a psychologist, Dr. Robert Shomer, who testified as a forensic expert on the accuracy of eyewitness identification.

14. Dr. Shomer testified that, based on his review of the case file, Cruz had described the

---

[1] Detective Lambert admitted that individuals in the photo lineup and physical lineup that Cruz had identified as the bottle-thrower were mere fillers, had no connection with the Sureños, and were not suspects in the case. (R.T. 355.)

ORIGINAL                                                    ORIGINAL

gunman to the police as a Hispanic male of unknown age wearing a black hooded sweatshirt and black pants. He stated that misidentification is the major cause of erroneous conviction, (R.T. 410), that most people resemble someone else (R.T. 412), and that current identification procedures can yield almost any result that you want. (R.T. 413.) Emotional stress affects perception. When a weapon is present, the witness focuses more on the weapon, than the circumstances, who is holding it or what they look like. (R.T. 419.)

15.  Dr. Shomer noted that there is far less accuracy in identification if the face is obscured from the bottom up. There is even less accuracy if the hairline, hair, type of hair, or shape of face is obscured. (R.T. 421.)

16.  A witness' initial identification is much more valuable than later identifications. Memory deteriorates over time. (R.T. 423.) After about a month, facial recognition is down to 50% or less accuracy even under the best conditions. (R.T. 470.) This means that what the witness says shortly after the incident is more critical than what he says months afterwards. (R.T. 471.) However, while witness accuracy goes down with the passage of time (R.T. 430), the confidence level of a witness goes up over time. (R.T. 431.)

17.  The officer presenting the lineup should not know which individual is the suspect, to avoid body language cues. An individual should not be repeated from one procedure to another, since a false identification can be due to repeated showing of the same photograph and not based on whether it is the person from the crime. (R.T. 425.)

18.  Younger people are more susceptible to suggestion, than older people. (R.T. 428.)

19.  People try to get some closure, try to figure out what occurred, what are the reasons, who did what to whom, and what was the sequence of events. What we believe occurred substitutes for what we saw occur. (R.T. 429.)

20.  Dr. Shomer insisted that the scientific community agreed that life-threatening stress had a negative effect on the accuracy of identification. Military research had confirmed this. (R.T. 435.) Experimenters can't test ordinary civilians in life threatening situations, so such studies have been limited to police-involved shootings and military situations. Such individuals are trained to deal with stress and should be more accurate, but they are not. (R.T. 438- 439.)

ORIGINAL                                              ORIGINAL

Police officers, because of their training, know how to react and distinguish between the "good guy" and the "bad guy", but are no better at recognizing a particular "bad guy." (R.T. 440.)

21.   There are special identification problems in gang situations, where gang members deliberately make themselves look alike, and where a gang member is motivated to identify any member of a rival gang as the culprit. (R.T. 465.)

22.   The prosecutor's cross-examination focused primarily on the fact that Dr. Shomer had been compensated for his expert testimony. Dr. Shomer admitted that he most often testified as a court-appointed expert and was compensated by the court.  Occasionally, as in this case, he testified as a privately retained defense expert. (R.T. 434.) The prosecutor asked Dr. Shomer that, because the prosecutor had heard Dr. Shomer testify in other cases that his fee was about $2,500 per case, and since Dr. Shomer had testified on direct that he had testified as an expert 400 times before, had Dr. Shomer earned over a million dollars testifying as an expert? While the amount of money Dr. Shomer had been paid in petitioner's case was marginally relevant to his credibility,[2] the total amount of money Dr. Shomer had ever earned as a forensic expert was obviously not.  Defense counsel did not object, however.  Dr. Shomer replied that the prosecutor's information was inaccurate and that, in fact, he had only received about $500 per case in about 300 of the cases in which he testified as an expert. (R.T. 434.)

23.   The prosecution did not present its own eyewitness identification expert to contradict any of the opinions Dr. Shomer had given.

### c. Prosecution's  closing argument

23. In explaining the jury instruction regarding the sufficiency of one witness' testimony for the proof of the fact, the prosecutor remarked:

> "...it's actually common in the Islamic religious faith that for certain crimes, they say absolutely got to have two witnesses or we're not going to be convinced. Well, you don't... under our constitutional representative republic, we have agreed to abide, all of us, by the laws we have together."

(R.T. 480.)  There is no record that any jurors were members of the Islamic religion who might have mistakenly applied such an alleged principle of Islamic law, or even that Islamic law

---

[2] The prosecutor, however, did not ask Dr. Shomer what his fee was in petitioner's case.

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                                    ORIGINAL

1    requires a minimum of two witnesses to convict a defendant of an attempted murder.

2        24.   Concerning the defense expert's testimony, the prosecutor argued that Dr. Shomer

3    was being paid a "tremendous amount of money" by the defense to testify. (R.T. 482.) There

4    was no evidence of what Dr. Shomer's fee was in petitioner's case.

5        25.   The prosecutor remarked that "Dr. Shomer admits it doesn't take an expert to

6    know" that if a witness sees someone's face close-up under bright lights, an image of the face is

7    more easily remembered, than when seen in the dark and at a distance (R.T. 482.), that Shomer

8    admitted there was no "unanimity" concerning the effect that stress has on the accuracy of

9    identification (R.T. 484), and that "common sense" says that "during traumatic events" a witness

10   will focus on not only the weapon, but the assailant's facial expression, to determine whether

11   the assailant really meant to assault him. (R.T. 485.) Dr. Shomer had testified that some well

12   educated people believe that stress increases the ability to remember. (R.T. 485) The prosecutor

13   suggested that the reasonable thing to do would be to look at the facial expression of the

14   gunman to see if he was really going to shoot. (485.) This, said the prosecutor, was is what Cruz

15   did. (R.T. 485).

16       26.   The prosecutor argued that Cruz had misidentified a non-suspect during the first

17   photo lineup because Cruz was drugged on morphine in the hospital.  He invited certain jurors

18   with medical training, to share their "background, training, and experience" with other jurors

19   in considering this. (R.T. 491).  The record shows that Cruz had originally been given morphine

20   for his injuries, but had been taken off the morphine before being moved to Kaiser, where

21   Detective Carattini interviewed him. (R.T. 225.)

22       27.   Discussing the second photo lineup and the physical lineup, the prosecutor

23   remarked:

24           "I think you may notice that there's been a change in the facial hair of Jorge
             Garcia between the time that he's in the physical lineup and the photo line up ...
25           an attempt to change one's appearance, if you find that to be the case, would be
             an indication that you know there's some consciousness that he might be
26           recognized." (R.T.496 .)

27   As is discussed in the memorandum, there is no evidence in the record that petitioner could have

28   changed his appearance to reflect the difference between the photo lineup and the physical

ORIGINAL                                    ORIGINAL

lineup.

27.  Discussing reasonable doubt, the prosecutor argued that a finding of reasonable doubt must be based on the "law and facts and evidence that's been introduced to you here in open court." (R.T. 498.) Discussing specific intent, the prosecutor argued that "what you're intending to do is also always shown by the nature and consequences of the act that you do." (R.T. 503.)

28.  Defense counsel did not object to any of this argument or request that the court admonish the jury.

## 4.  Claims for Relief

29. The prosecutor improperly referred to matters during closing argument that were outside of the evidence presented at trial, misrepresented evidence that had been presented at trial, and by doing so, violated petitioner's Fifth and Fourteenth Amendment right to due process, by:

a. Comparing the alleged requirement of "Islamic law" that two eyewitnesses are required to convict, with American law that requires only one witness, making it appear that any juror who found a reasonable doubt would be following a law of an enemy religious movement.

b. Referring to the "tremendous" size of the defense expert's fee when there was no evidence of the amount of the fee in the record.

c. Misrepresenting the defense expert's testimony about identification "close up, under bright lights" to make it appear as if the complaining witness had identified his assailant under such conditions.

d. Misrepresenting the defense expert's testimony to make it appear that life-threatening stress could increase the accuracy of identification.

e. Arguing that the complaining witness misidentified a non-suspect at the first photo lineup because CW was drugged on morphine at the hospital, when the evidence showed that CW had been taken off morphine by the time he viewed the lineup.

f. Arguing that petitioner had "changed his appearance" to avoid being recognized as the gunman, when there was no evidence from which the jury could infer this.

30.  The prosecutor misstated applicable law in violation of petitioner's Fifth and Fourteenth Amendment right to due process, in the following manner:

a. Inviting jurors with expertise in interpreting medical records to interpret such records for the other jurors.

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                            ORIGINAL

b. Mischaracterizing reasonable doubt and attempting to shift the burden to the defense, by arguing that the defense needed to present some evidence to support a reasonable doubt.

31. Defense counsel was ineffective, in violation of petitioner's Sixth Amendment right to the effective assistance of counsel and Fourteenth Amendment right to due process, in failing to object to the improper argument, request admonitions, and move for a new trial.

32. The cumulative effect of the error deprived petitioner of a fair trial in violation of his Fifth and Fourteenth Amendment right to due process.

33. Petitioner is prejudiced. Absent the errors set forth here, a reasonable juror could have found a reasonable doubt of petitioner's guilt.

### 5. Need for habeas remedy.

34. Petitioner presents this petition to this court as an original proceeding in habeas corpus. Petitioner has no other plain, speedy, or adequate remedy at law.

### 6. Need for evidentiary hearing

35. Petitioner does not know yet whether respondent will dispute his contention that defense counsel's conduct fell below an objective standard of reasonableness. Petitioner's position is that any attempt by respondent to propose "legitimate tactical reasons" for defense counsel's acts and omissions that are not based on evidence showing that defense counsel actually relied on such reasons would be insufficient to raise a material evidentiary dispute concerning this issue, and that, in such event, this court would have to conclude that defense counsel had no legitimate tactical reasons for his acts and omissions. Should respondent present evidence that defense counsel actually relied on certain tactical reasons, and not just argument that defense counsel could have relied on such reasons, or should the court conclude that argument that defense counsel could have relied on such reasons is sufficient to raise a material evidentiary dispute concerning the issue, petitioner would be entitled to an evidentiary hearing on the issue of the ineffectiveness of trial counsel, because he did not have a reasonable opportunity to obtain an evidentiary hearing in the state court proceedings.

### 7. Relief requested

Wherefore, Petitioner respectfully requests that this court, following briefing on the

merits: (a) hold an evidentiary hearing on any disputed issues of material fact, if any, (b) issue a writ of habeas corpus, and (c) grant whatever further relief is appropriate.

Dated: Oakland, California, Tuesday, November 27, 2007.

**Robert J. Beles**
Paul McCarthy
Attorneys for Petitioner

### VERIFICATION

Petitioner is in custody and incarcerated outside the County of Alameda. I therefore verify the petition on his behalf. I declare under penalty of perjury that the facts set forth in this petition are true and correct based on my review of the record. Executed in Oakland, California, on Tuesday, November 27, 2007.

**Paul McCarthy**
Declarant

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                            ORIGINAL

1

### United States District Court
### Northern District of California

2

3   JORGE GARCIA,                                    No.

4                 *Petitioner,*                       MEMORANDUM OF POINTS AND
          vs.                                         AUTHORITIES

5

6   ROBERT HOREL, Warden, Pelican Bay
    State Prison,

7                 *Respondent.*

8   PEOPLE OF THE STATE OF CALIFORNIA,

9                 *Real Party in Interest.*

10

11              **MEMORANDUM OF POINTS AND AUTHORITIES**

12   **1. The prosecutor improperly referred to matters during closing
        argument that were outside of the evidence presented at trial, and**
13      **misrepresented evidence that had been presented at trial.**

14                          **a. "Islamic law"**

15       The prosecutor's argument that the "Islamic" rule that one needs two eyewitnesses to

16   convict is not the law of this country was obviously a plea to the jury not to find a reasonable

17   doubt simply because the prosecution's case was based solely on Cruz's questionable testimony.

18   The prosecutor could have legitimately made the argument simply by referring to the

19   appropriate jury instruction. His reference to Islam was totally gratuitous. This Hispanic youth

20   gang case had nothing to do with Islam.  Nothing in the record suggesting that any of the

21   witnesses were Muslims, or that there were Muslims on the jury who might have been

22   considering acquitting petitioner based on supposed Islamic principles.  There was nothing in

23   the record suggesting that a "two witness rule" was even a part of "Islamic" law.

24       In less stressful times, this remark might be considered an odd academic illustration. Since

25   the 9-11 bombings, however, which were linked to an Islamic fundamentalist political

26   organization, simultaneous wars in Afghanistan and Iraq directed against this organization, and

27   the takeover of Iran by Islamic fundamentalists, references to the Muslim religion are anything

28   but academic. In the popular mind, the word "Islamic" conjures up images of fanatics, suicide

ORIGINAL                                                    ORIGINAL

bombers, enemies of America, and terrorism. Given recent history, the prosecutor's reference to "Islamic law" was as if, in the mid-1950s, at the height of the Cold War, a prosecutor had argued that "in Communist Russia, the Communists say you have to have two witnesses to convict someone, but under our constitutional representative republic, in which we all live under, one honest witness is enough." (See *People v. Parmelee* (1934) 138 Cal.App. 123, in which the prosecution attempted to associate defendant with the Communist party.) The jury could have understood the argument as suggesting that finding a reasonable doubt because only Cruz identified petitioner was like following the laws of America's enemies.

Even in the absence of widespread prejudice against Muslims, negative references to religious and other minorities have been held to be misconduct and prejudicial. *See People v. Singh* (1936) 11 Cal. App.2d 244, 255 ("Hindoo race"), *People v. Simon* (1927) 80 Cal.App. 675, 677, ("Jews"), *Bains v. Cambra*, 204 F.3d 964, 974-75 (9th Cir. 2000) ("Sikhs"), *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000) (appeals to racial, ethnic, or religious prejudice violate a defendant's Fifth Amendment right to a fair trial.)

The Court of Appeals ruled that it was not "reasonably likely" that the jury would have interpreted the prosecutor's remarks in this way, and compares the remarks to *People v. Gionis* (1995) 9 Cal.4th 1196, in which the prosecutor quoted from the Bible to the effect that the truly guilty should be convicted. *Id* at p. 1220. There was no comparison between the two. Convicting the truly guilty is a truism, but here, the prosecutor argued that acquitting petitioner because only Cruz had identified him would be wrong and like following a foreign law. Considering the fact that Cruz had identified the wrong person at first, and the fleeting circumstances of his observations, it would have been a reasonable exercise of their duties as American jurors to find a reasonable doubt. The Court of Appeals offers no explanation of why the prosecutor would have otherwise dragged Islam into his example at all. It would not have been unreasonable for the jury to place the "hostile religion" gloss on the prosecutor's remarks when there appeared to be no other reason for mentioning "Islamic law."

### b. Dr. Shomer's fee.

The prosecutor's argument that Dr. Shomer had been paid a "tremendous amount of

ORIGINAL                                                                ORIGINAL

money" to testify for the defense was clearly not supported by the record – if "defense" is understood to refer to petitioner's case. There was no evidence of the fee Dr. Shomer actually charged in petitioner's case, only evidence that Shomer charged $150 per hour and had a fee ***cap*** of $2,500 per case. (R.T. 406.) The Court of Appeals held that the prosecutor could reasonably infer that Dr. Shomer must have charged up to the maximum $2,500 in this case.  The prosecutor, of course, didn't have to infer anything – he could have asked Dr. Shomer what he was paid in petitioner's case.

The Court of Appeals assumed the prosecutor was referring to the fee charged only in petitioner's case, and held that an expert may be impeached by showing that he is being paid by the adverse party.  But the prosecutor didn't impeach Dr. Shomer simply because he had been paid, but because he had been paid a "tremendous amount of money" Since $2,500 is not a "tremendous amount of money," a reasonable juror could have understood the argument as implying that Dr. Shomer was being paid a great deal more than his normal fee in order to testify favorably, although there was no evidence of this.  Or, more likely, such a juror could have understood the argument as a reference to the amount of money Dr. Shomer earned in his entire career as a forensic expert.  Although there was some evidence of this amount, his total earnings would absolutely not have been relevant to showing Dr. Shomer's bias in this case.  Dr. Shomer's testimony for petitioner could obviously not affect the amount of money he had previously earned.  The only purpose of the argument would have been the impermissible one of inciting juror resentment against Dr. Shomer as a person who was able to make money simply by coming to court and testifying.

### c. Identification "close up, under bright lights"

The prosecutor's remark that "Dr. Shomer admits it doesn't take an expert to know" that if a witness sees someone's face close-up under bright lights, an image of the face is more easily remembered, than when seen in the dark and at a distance" would have suggested to an inattentive juror that Cruz had seen the shooter's face "close up, under bright lights." In fact, the evidence showed that Cruz had seen the shooter from a distance of between 25 and 40 feet away, at night (R.T. 215, 362). The Court of Appeals' holding that a reasonable juror would not

m-3

ORIGINAL                                                          ORIGINAL

have made such a mistake is like their holding on the prosecutor's "Islamic law" remark. It would not be unreasonable for a juror to adopt such an interpretation when the alternative would be to conclude that the prosecutor was trying to *undermine* his own witness' identification.

Moreover, Dr. Shomer did not testify that an identification made in close proximity and under bright lights would be accurate. He said the opposite, that accuracy is not guaranteed by good lighting or proximity. (R.T. 412.)

### d. Effect of stress on accuracy of identification.

The prosecutor argued that Dr. Shomer had testified that "there is no unanimity in the field" regarding the effect that stress has on the accuracy of identification.

In fact, Dr. Shomer's testimony was the opposite. He testified that the scientific community agreed that had a *negative* effect on the accuracy of identification (R.T. 435) and that there was no authority that stress would aid in accurate identification. (R.T. 437.)

The Court of Appeals erroneously concluded that Dr. Shomer testified that Dr. Mishkin believed that stress aids in identification. Dr. Shomer actually testified that Dr. Mishkin had offered the somewhat obvious theory that a prey animal like a deer would have an evolutionary advantage in recognizing the *general appearance* of a predator like a lion, so that it could avoid lions. However, said Dr. Shomer, "there is no evolutionary significance at all to remember the face of a particular lion." (R.T. 437-438.) This was similar to Dr. Shomer's testimony that police officers can be trained to distinguish between the "good guy" and the "bad guy" but are no better at recognizing a particular "bad guy" than anybody else. (R.T. 440.) In this case, it obviously helped Cruz to be able to instantly recognize that the man getting out of a car with a shotgun probably meant him no good.  This does not mean that Cruz would have had any better memory of the man than a menacing man with a gun.

The prosecutor argued that a witness would focus attention on the barrel of the gun and "whatever else would enable survival, the facial expression or look in eye of perpetrator", and that a witness under stress would have an "adrenaline surge" that would enable the witness to be "very focused on survival."(R.T. 485) Dr. Shomer's testimony, again, was the opposite: He

ORIGINAL                                                           ORIGINAL

1    said that an individual confronted with a life threatening situation like a pointed gun would

2    "focus on the weapon" and:

3      "...once you focus in on that weapon, you're focused less on the circumstances of
     where it is, who's holding it, what they look like. It's far more functional to pay

4      attention to the weapon than it is to anything around it. And that's exactly what
     the research confirms. People are less accurate in eyewitness identification

5      involving something that you can see that's dangerous, that causes you pain."

6    (R.T. 419.) Dr. Shomer testified that a life threatening situation like a gun would cause an

7    "adrenaline flow" that would "work differently" than if the individual was not under stress (R.T.

8    420), but he did **not** testify that this "adrenaline flow" would aid in identification of the person

9    holding the gun. In Cruz's case, this "adrenaline flow" enabled Cruz to instantly turn around

10    and run, as Cruz testified he did..

11      Concerning Cruz, the prosecutor argued that the "reasonable" thing to do would be to

12    look at the facial expression of a person with a gun to see if he was really going to shoot, and

13    that "obviously" this is what Cruz did; he concluded that the shooter was going to shoot, turned,

14    and ran. (R.T. 485). The prosecutor's suggestion would have been a stupid thing for Cruz to do

15    under the circumstances.   He was dressed in Norteño red.  The car pulled up, one person got

16    out, threw a bottle at him, and yelled "chap" – meaning "I am a Sureño and have spotted you

17    as a Norteño." A second man got out with a shotgun and started to raise it.  Cruz testified that

18    the moment he saw the gunman do that, he turned and ran. (R.T. 248.) The thought that the

19    man with the gun might simply be bluffing did not even go through Cruz's mind, judging by

20    Cruz' testimony. (R.T. 299-303.)

21      The Court of Appeals opined that Cruz would have had to look at the "gunman" to look

22    at the gun, but that is not what the prosecutor argued. The prosecutor argued that Cruz looked

23    at the gunman's face  – which Cruz never testified to.

24              **e. Earlier incorrect identification affected by morphine.**

25      The prosecutor's argument that Cruz's earlier mistake in identifying a non-suspect as the

26    gunman was caused by morphine was clearly a misrepresentation of the record.  The record

27    indicated that Cruz had been taken off morphine before being moved to Kaiser, where Detective

28    Carattini interviewed him. (R.T. 225.)

ORIGINAL                                                                ORIGINAL

**f. Petitioner had "changed his appearance"**
**to avoid being recognized as the shooter.**

Discussing the second photo lineup and the physical lineup, the prosecutor remarked:

"I think you may notice that there's been a change in the facial hair of Jorge Garcia between the time that he's in the physical lineup and the photo line up ... an attempt to change one's appearance if you find that to be the case, would be an indication that you know there's some consciousness that he might be recognized." (R.T. 496 .)

The Court of Appeals held:

"Petitioner claims this comment was misconduct because 'there was no evidence that the photo of petitioner in the photo lineup . . . had been taken after the shooting.'

We reject petitioner's argument because it is based on a false premise. The prosecutor did not state petitioner had changed his appearance since the shooting. He suggested petitioner had changed his appearance since the first photo line-up."

The Court of Appeal misinterpreted the prosecutor's argument.  Cruz was not asked, at the physical lineup, to pick out the individual who most closely resembled the photo he had seen in the photo lineup.  He was asked to identify the individual who resembled the actual gunman. The Court of Appeal may have assumed that Detectives Carattini and Lambert used different photos of petitioner in the two lineups, since Cruz identified a filler in Carattini's lineup, but this is not what the prosecutor argued.  He argued that there was a difference in petitioner's appearance between the photo lineup and the physical lineup, suggesting that petitioner had deliberately changed his appearance in order to avoid being recognized.

Typically, a "change of appearance" argument is based on evidence that a suspect changed his appearance after the crime to avoid later identification.  A "change in appearance" argument that a suspect changed his appearance between two identification proceedings makes no sense, since normally, a suspect would not know that a photo lineup was even being conducted, and there was no evidence that petitioner knew about the photo lineup, let alone which photo of himself the police might have used.  Thus, a reasonable juror would have had to understand the prosecutor's argument as saying that petitioner's photo in the photo lineup was what petitioner looked like at the time of the shooting, and petitioner changed his appearance since then.  But there was no evidence supporting this.  This was not like a photo taken at the time of a bank

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                                    ORIGINAL

robbery by an automatic camera, showing a suspect. There was no evidence in the record as to when the photo in the lineup was taken – or that it was taken close enough in time to the incident so that petitioner's appearance would have probably closely resembled the photo. Thus, there was no evidence concerning when petitioner might have changed his appearance, except that he did so after the photo was taken. A change in appearance before the incident would not prove anything at all.

The Court of Appeals held that the unreasonableness of the prosecutor's argument did not matter, citing *People v. Thomas* (1992) 2 Cal. 4th 489, 527 for the proposition that "a defendant may not complain on appeal if the prosecutor's reasoning is faulty or his conclusions are illogical because those are matters for the jury to determine." This language appears on page 526 of the opinion, but *People v. Thomas* goes on to qualify that language by holding that any inference the prosecutor asks the jury to draw must have "some basis in the evidence" as opposed to an inference "based on mere suspicion, imagination, speculation, surmise, conjecture, or guesswork." *Id.* at 527, citing *People v. Morris* (1988) 46 Cal.3d 1, 21. Since there was no evidentiary support for any inference that petitioner had changed his appearance, the argument was improper.

### g. Applicable law

It is well established "that statements of fact not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." *People v. Bolton* (1979) 23 Cal.3d 208, 212 (suggestion that the petitioner may have had a prior conviction), *People v. Johnson* (1981) 121 Cal.App.3d 94, *People v. Villa* (1980) 109 Cal.App.3d 360, 363-364 (prosecutor told jury that he had evidence of guilt that he had not presented), *People v. Frye* (1998) 18 Cal.4th 894, 976-977 (same), *United States v. Ramirez-Lopez* (9th Cir 2003) 315 F.3d 1143 (misconduct to argue that witnesses had been threatened when the evidence showed that only one witness had been threatened), *People v. Purvis* (1963) 60 Cal. 2d 323 (a prosecutor's "vigorous presentation of facts favorable to her side . . . does not excuse either deliberate or mistaken misstatements of fact.")

A prosecutor may not misstate or invent evidence during closing argument. *Drayden v.*

ORIGINAL                                                      ORIGINAL

1   *White*, 232 F.3d 704, 713 (9th Cir. 2000) (prosecutor invented character of dead victim and

2   "testified" in victim's voice during closing argument). Such misconduct violates a defendant's due

3   process rights if it renders a trial "fundamentally unfair." *Drayden v. White,* id, citing *Darden*

4   *v. Wainwright*, 477 U.S. 168, 183, 91 L. Ed. 2d 144, 106 S. Ct. 2464 (1986), *Hall v. Whitley*,

5   935 F.2d 164, 165 (9th Cir. 1991), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.

6   Ct. 1868, 40 L. Ed. 2d 431 (1974), *United States v. Blueford*, 312 F.3d 962 (9th Cir. 2002),

7   *United States v. Kojayan*, 8 F.3d 1315, 1318-19, 1321, 1324 (9th Cir. 1993), *Commonwealth*

8   *of Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 487 (9th Cir. 1992), *Reutter v. Solem*,

9   888 F.2d 578, 581 (8th Cir.1989), *United States v. Valentine*, 820 F.2d 565, 566 (2nd Cir. 1987),

10  *United States v. Marques*, 600 F.2d 742, 749 (9th Cir.1979), cert. denied, 444 U.S. 1019 (1980),

11  *United States v. Artus*, 591 F.2d 526 (9th Cir. 1979.)

12      It is improper for the prosecution to appeal to the prejudice of the jury in closing

13  argument, *United States v. Solivan* (6th Cir. 1991) 937 F.2d 1146 (jury should "send a message"

14  to all drug dealers by convicting petitioner held to deprive petitioner of a fair trial and due

15  process of law), *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) ("a prosecutor may

16  not urge jurors to convict a criminal defendant in order to protect community values, preserve

17  civil order, or deter future lawbreaking"), *United States v. Weatherspoon*, 410 F.3d 1142, 1149

18  (9th Cir. 2005) (prosecutor may not "point to a particular crisis in our society and ask the jury

19  to make a statement.")

20      A prosecutor, in effect, improperly presents  false evidence by offering inferences in

21  closing argument that he knows to be false, or has very strong reason to doubt. *United States v.*

22  *Blueford*, 312 F.3d at 968. "The difference between a lawyer 'ask[ing] the jury to infer only

23  things that he believed in good faith might be true' and making 'factual assertions he well knew

24  were untrue' is 'the difference between fair advocacy and misconduct.' *Blueford, id.*, quoting

25  *United States v. Kojayan*, 8 F.3d at 1324 (9th Cir.1993.)

26

27

28

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities

ORIGINAL                                                              ORIGINAL

## 2. The prosecutor improperly misstated the law.

### a. Inviting jurors to rely on the expertise of other jurors concerning interpretation of medical records.

Concerning the possible effect of Cruz' medical condition on his misidentification in the first photo lineup presented to him the prosecutor remarked to the jury:

> "some of you have plenty of training on how to read medical records, you know, you don't get to act as an expert witness in this case, but your background, training, and experience certainly could be helpful to other jurors."

(R.T. 491). This invited some jurors to interpret technical language in medical records for jurors without such background and experience. The Court of Appeals cited *People v. Steele* (2002) 27 Cal.4th 1230, 1266, as saying that jurors may use their technical experience in evaluating evidence, but do not mention the Supreme Court's cautionary remark that "A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct." *Steele, id*, citing *In re Malone* (1996) 12 Cal. 4th 935, 963. *Malone* held improper a juror who expressed negative opinions on the reliability of the defendant's polygraph evidence, based on her own professional study of psychology. The Supreme Court noted that although most of the juror's assertions merely reflected evidence and argument presented in the trial, her assertion that this information was drawn from her own professional knowledge was improper.

Unlike both *Steele* and *Malone*, which involved consideration of the actual conduct of the jurors in deliberation, we do not know what the jury might have done in response to the prosecutor's suggestion. But that suggestion was broad enough so that a juror with medical knowledge, for example, could have told the other jurors that a particular code or abbreviation in the records had a specific meaning that was not obvious and never discussed at trial. Since it is misconduct for the jury to rely on definitions of technical terms provided by other jurors, *People v. Harper* (1986) 186 Cal.App.3d 1420, the prosecutor's broad comment advised the jury that they could do something improper and thus misstated the law "It is improper for the prosecutor to misstate the law" (here, by advising the jury that they could legitimately rely on

ORIGINAL                    ORIGINAL

the medical expertise of some jurors.) *People v. Hill* (1998) 17 Cal. 4th 800 at 829, citing *People v. Bell* (1989) 49 Cal. 3d 502.

b. **Mischaracterizing reasonable doubt; burden shifting.**

Discussing reasonable doubt, the prosecutor argued that a finding of reasonable doubt must be based on the "law and facts and evidence that's been introduced to you here in open court." (R.T. 498.) It is improper for the prosecutor to argue that "There has to be some evidence on which to base a doubt." *People v. Hill*, 17 Cal.4th at 831-832, since it was reasonably likely that the jury understood the comment "to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." The prosecutors' comments here and in the *Hill* case are almost indistinguishable. An attempt to shift the burden of proof is also a violation of the Fifth Amendment's right not to be convicted except upon proof beyond a reasonable doubt, see *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), below.

Discussing specific intent, the prosecutor argued that "what you're intending to do is also always shown by the nature and consequences of the act that you do." (R.T. 503.) Instructing the jury that the law presumes a person intends the ordinary consequences of his voluntary acts has been disapproved as an unconstitutional shifting of the burden of proof from the prosecution by permitting the jury to find guilt without finding that all elements of an offense must be proven beyond a reasonable doubt. *Sandstrom v. Montana, supra.*

**3. Trial counsel was ineffective in failing to object
to the errors described in this petition or seek
appropriate relief for such errors.**

"Every criminal defendant has a constitutional right to competent legal representation. *People v. Pope* (1979) 23 Cal. 3d 412; United States Constitution, Sixth and Fourteenth Amendments. To establish a claim of ineffective assistance of counsel, the accused must show that the trial attorney's representation was deficient, in that it fell below an objective standard of reasonableness, and that the accused was prejudiced by the trial attorney's deficient performance. *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 104 S. Ct. 2052, 2064-2065, 80 L. Ed. 2d 674; *People v. Ledesma* (1987) 43 Cal. 3d 171, 216-217. To establish prejudice, the accused must show that but for the trial attorney's assertedly deficient representation it was reasonably probable that the outcome of the proceeding would have been more favorable to the accused. *Strickland v. Washington, supra,* 466 U.S. at pp. 688, 693-694 *People v. Ledesma, supra,* 43 Cal. 3d at pp. 215-218."

ORIGINAL                                                                    ORIGINAL

*People v. Donaldson* (2001) 93 Cal. App. 4th 916 at 931-932. The *Donaldson* court had no difficulty concluding that trial counsel's failure to object to errors similar to some of those that occurred here (prosecutor testifying and vouching witness) was ineffective assistance under *Strickland*.

> "Errors and omissions of defendant's trial attorney denied her the right to trial court adjudication of whether the prosecutor should take the stand as a witness, whether certain questions she answered were objectionable, whether she should withdraw from the case afterward, whether certain argument she made was objectionable, and whether the jury should receive ameliorative admonition. Had he raised those issues, the trial court could have exercised its plenary authority to conform the conduct of the trial to the requirements of due process. The errors and omissions of defendant's trial attorney created a reasonable probability of a less favorable outcome than if he had represented her competently."

*People v. Donaldson, id.* at 932.

### 4. Petitioner would be entitled to an evidentiary hearing on the issue of ineffective assistance of counsel if respondent raises a material dispute on the issue.

Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires the district court, if it grants an order to show cause, to independently review the record to determine whether or not an evidentiary hearing is "warranted." The Commentary to Rule 8(a) indicates that "warranted" includes determining whether an evidentiary hearing is mandatory and also whether it is "desirable" if not mandatory. Commentary, quoting *Townsend v Sain*, 372 US 293, 318, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963). Determining whether a non-mandatory hearing is "desirable" calls for an exercise of the court's discretion, but under Rule 8(a), the court must consider the "desirability" of an evidentiary hearing.

An evidentiary hearing is required if there is a material dispute of fact, which, if resolved in petitioner's favor, could justify granting petitioner relief.

Petitioner contends that defense counsel's conduct fell below an objective standard of reasonableness. Petitioner does not know yet whether respondent will dispute this. Petitioner's position is that any attempt by respondent to propose "legitimate tactical reasons" for defense counsel's acts and omissions that are not based on evidence showing that defense counsel actually relied on such reasons would be insufficient to raise a material evidentiary dispute

ORIGINAL                                                    ORIGINAL

concerning this issue. In other words, to raise a material dispute of "fact", respondent would have to present evidence, presumably in the form of a statement by defense counsel showing what his "tactical reasons" in fact were. If respondent presents no "facts", petitioner contends that this court would have to conclude that defense counsel had no legitimate tactical reasons for his acts and omissions.

Should respondent present evidence that defense counsel actually relied on certain tactical reasons, and not just argument that defense counsel could have relied on such reasons, or should the court conclude that argument that defense counsel could have relied on such reasons is sufficient to raise a material evidentiary dispute concerning the issue, petitioner would be entitled to an evidentiary hearing on the issue of the ineffectiveness of trial counsel, because he did not have a reasonable opportunity to obtain an evidentiary hearing in the state court proceedings.

In determining whether a petitioner is entitled to an evidentiary hearing under AEDPA, the district court:

> "must determine whether a factual basis exists in the record to support the petitioner's claim. If it does not, and an evidentiary hearing might be appropriate, the court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has 'failed to develop the factual basis of a claim in State court.' . . . . If the applicant has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate or required under *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963)[overruled on other grounds in *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 5, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992)]."

*Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005), quoting *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) and *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999).

Under AEDPA, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Insyxiengmay v. Morgan*, 403 F.3d at 670, quoting *Williams v. Taylor*, 529 U.S. 420, 432, 146 L. Ed. 2d 435, 120 S. Ct. 1479 (2000). In *Insyxiengmay*, the defendant claimed an informer was a material witness and challenged the trial court's decision to exclude him and defense counsel from an in-camera hearing on the materiality of the informer's testimony as a violation of his rights to due process and the effective assistance of counsel under the Fifth and

ORIGINAL                                                                          ORIGINAL

Sixth Amendments. The Ninth Circuit held that "fault cannot be attributed to *Insyxiengmay*"

in failing to develop the factual basis of his claim that the informer was a material witness

"because both he and his counsel were barred from the *in camera* hearing." *Id.* Fault also could

not be attributed to Insyxiengmay's counsel, because the court excluded counsel from the *in

camera* hearing and refused to allow him to submit questions for the court to ask the informant.

*Insyxiengmay v. Morgan*, 403 F.3d at 671. See *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir.

1997) ("It is clear that *Jones* did not 'fail to develop' the factual basis of either of his claims;

rather, the state courts denied him the opportunity to develop the facts by failing to hold an

evidentiary hearing.")

A petitioner is entitled to an evidentiary hearing in federal court if the state court's

decision was an unreasonable determination of the facts. *Earp v. Ornoski*, 431 F.3d at

1166-1167, citing *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144

(2003).

> "*Townsend* establishes that a defendant is entitled to an evidentiary hearing if he
> can show that:
>
>> (1) the merits of the factual dispute were not resolved in the state
>> hearing; (2) the state factual determination is not fairly supported
>> by the record as a whole; (3) the fact-finding procedure employed
>> by the state court was not adequate to afford a full and fair hearing;
>> (4) there is a substantial allegation of newly discovered evidence;
>> (5) the material facts were not adequately developed at the
>> state-court hearing; or (6) for any reason it appears that the state
>> trier of fact did not afford the habeas applicant a full and fair
>> hearing.
>
> *Townsend*, 372 U.S. at 313. If the defendant can establish any one of those
> circumstances, then the state court's decision was based on an unreasonable
> determination of the facts and the federal court can independently review the
> merits of that decision by conducting an evidentiary hearing. See *Taylor v.
> Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ('If, for example, a state court makes
> evidentiary findings without holding a hearing and giving petitioner an
> opportunity to present evidence, such findings clearly result in an "unreasonable
> determination" of the facts.').'"

*Earp v. Ornoski*, 431 F.3d at 1167.

Where the factual basis for a claim is "adequately proffered" to the state court, a

petitioner is entitled to an evidentiary hearing in federal court:

> "Where the petitioner establishes a colorable claim for relief and has never been

ORIGINAL                                                    ORIGINAL

afforded a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing. *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004); *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001). In other words, a hearing is required if: '(1) [the defendant] has alleged facts that, if proven, would entitle him to habeas relief, and (2) he did not receive a full and fair opportunity to develop those facts[.]' *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004)."

*Earp v. Ornoski, id.*

In *Earp v. Ornoski*, defendant claimed that the prosecutor committed misconduct by intimidating a post-trial witness named Michael Taylor to prevent him from testifying in support of a new trial motion. Defendant was charged with murder of a child. At trial, defendant testified that he had been babysitting the child and working around the house when another individual, Morgan, arrived. Defendant went outside to clean paintbrushes and left Morgan alone with the child. About a half hour later, defendant went back inside, found the child motionless at the bottom of a flight of stairs, and called emergency services. Morgan testified that he had never been to the child's house. No witness other than defendant was able to place Morgan at the house.

After defendant was convicted of murdering the child, defendant located a jail inmate, Taylor, who had been in jail with Morgan and had overheard Morgan tell another inmate that he had been at the house on the day the child died and that he was afraid defendant would "come after him" because he had lied at trial. Taylor made an initial statement to this effect to the defense investigator, and then retracted it. He later declared that he had retracted the statement because the prosecutor and a sheriff's deputy had told him "would never get out" if he stood by his statement.

Defendant supported his claim in the state collateral relief petition with declarations from Taylor, the defense investigator, defendant's attorney, and a transcript of part of the prosecutor's interview with Taylor. Without conducting a hearing, the state court denied Earp's prosecutorial misconduct claim.

Under these circumstances, the Ninth Circuit held that Taylor had "adequately proffered" the factual basis of his claim to the state court, but never received an opportunity to develop his claim of prosecutorial misconduct in state court, because the state court had not held an

Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities

ORIGINAL                                        ORIGINAL

evidentiary hearing.

> "Because we find that such a hearing was necessary to make the credibility determination upon which rejection of Earp's claim depends, we conclude that he has not had a 'full and fair' opportunity to develop the facts supporting his claim, see *Townsend*, 372 U.S. at 313, and, consequently, the state court decision summarily denying him habeas relief was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2); *Taylor [v. Maddox]*, 366 F.3d at 1001."

*Earp v. Ornoski*, 431 F.3d at 1169.

Petitioner here filed a companion collateral relief petition in the Court of Appeal, but the Court of Appeal did not hold any evidentiary hearing on trial counsel's alleged ineffectiveness. Under California collateral relief procedures, the California court does not reach the question of whether to hold an evidentiary hearing unless it first issues an order to show cause. *In re Lewallen* (1979) 23 Cal.3d 274, 278, *In re Lawler* (1979) 23 Cal.3d 190, 194. After the court has filed its order to show cause and all of the briefing has been filed, the court is required to hold an evidentiary hearing if a reasonable likelihood exists that the petitioner is entitled to relief and his claim depends on the resolution of a factual issue. There is no state rule of procedure that petitioner must request an evidentiary hearing in the petition. *In re Lawler* (1979) 23 Cal.3d 190, 194, California Rules of Court 4.551(f). Since the state court did not issue an order to show cause, petitioner never had an opportunity for an evidentiary hearing under state procedures.

As discussed above, where the factual basis for a claim is "adequately proffered" to the state court, but the state court does not hold an evidentiary hearing, a petitioner is entitled to an evidentiary hearing in federal court if he has alleged facts that, if proven, would entitle him to habeas relief, and he did not receive a full and fair opportunity to develop those facts in state court. See *Earp v. Ornoski*.

Where petitioner has presented a colorable claim of ineffective assistance of counsel, issues such as whether counsel's acts and omissions represented "strategic decisions reached after 'thorough investigation of law and facts relevant to plausible options'" cannot ordinarily be determined without a factual hearing. *Earp v. Ornoski*, 431 F.3d at 1179, quoting *Strickland v. Washington*, 466 U.S. at 690.

ORIGINAL                    ORIGINAL

As argued previously, petitioner did all he could do in state court to obtain an evidentiary hearing, but was unsuccessful. As such a hearing was necessary to determine whether trial counsel had any legitimate tactical reasons for doing what he did, the district court should have granted an evidentiary hearing on the above ineffectiveness issue.

### 5. Cumulative error

The court considers the prejudicial effect of all errors on appeal cumulatively, not in isolation. *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2002). The cumulative effect of the errors was prejudicial.

### 6. Conclusion

For the above reasons, petitioner requests that this court issue a writ of habeas corpus.

Dated: Oakland, California, Tuesday, November 27, 2007

**Robert J. Beles**
Attorney for Petitioner

Petition for Writ of Habeas Corpus;  Memorandum of Points and Authorities